**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| CHOREO, LLC, a Delaware limited liability company, <br><br>     Plaintiff, <br><br> v. <br><br> KEVIN LORS, AARON SCHOMER, JOLEEN SCHEER, LINDSEY O'NEIL, in their individual capacity, and ATOMI FINANCIAL GROUP, INC., d/b/a COMPOUND PLANNING, <br><br>     Defendants. | Case No. _____ |

## COMPLAINT

Plaintiff, Choreo, LLC (formerly known as RSM US Wealth Management, LLC, McGladrey Wealth Management LLC, RSM McGladrey LLC, and RSM McGladrey Inc. and collectively herein, "Choreo"), through its undersigned counsel, hereby files this Verified Complaint for Injunctive Relief and Damages against Defendants Kevin Lors ("Lors"), Aaron Schomer ("Schomer"), Joleen Scheer ("Scheer"), Lindsey O'Neil ("O'Neil") (each an "Individual Defendant," and collectively, "Individual Defendants"), and Atomi Financial Group, Inc., d/b/a Compound Planning ("Compound"), and states as follows:

## PARTIES

1.    Choreo is a Delaware limited liability company with its principal place of business in Rockford, Illinois.

2.    Lors, an individual, resides and is domiciled in Norwalk, Polk County, Iowa.

3.     Schomer, an individual, resides and is domiciled in Ankeny, Polk County, Iowa.

4.     Scheer, an individual, resides and is domiciled in Ankeny, Polk County, Iowa.

5.     O'Neil, an individual, resides and is domiciled in Waukee, Dallas County, Iowa.

6.     Compound is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 609 Greenwich Street, New York, New York 10014.

## JURISDICTION

7.     Jurisdiction is proper over the parties pursuant to 28 U.S.C. § 1331 because Choreo asserts federal claims against the Defendants under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* Jurisdiction is proper over the remaining claims pursuant to 28 U.S.C. § 1367 because the claims form part of the same case or controversy as Choreo's federal question claims under the DTSA.

8.     This Court has personal jurisdiction over the Defendants Lors, Schomer, Scheer and O'Neil because they are citizens and residents of the State of Iowa.

9.     This Court has personal jurisdiction over Compound because Compound conducts business in Iowa through the Individual Defendants and engaged in unlawful conduct aimed at parties and property within the State of Iowa.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because it is a district within which a substantial part of the events or omissions giving rise to Choreo's claims occurred.

# FACTUAL BACKGROUND

## History of Choreo

11.     Choreo is an investment adviser registered with the United States Securities and Exchange Commission that provides investment advisory services, aggregated reporting, financial planning, wealth management consulting, and retirement plan consulting and advisory services to a broad range of clients across the United States.

12.     Choreo's clients include individuals, families, closely held business owners, and executives of both large and small companies.

13.     Choreo was previously known as RSM US Wealth Management LLC, before that as McGladrey Wealth Management LLC and before that as RSM McGladrey, Inc.[1] (collectively "RSM US").

14.     Until February 18, 2022, RSM US was the wealth management subsidiary at the tax and accounting firm, RSM US LLP.  On that date, RSM US LLP sold RSM US to Choreo Buyer, LLC ("Choreo Buyer").  Choreo Buyer paid RSM US LLP a multiple based upon earnings at the time of the transaction with the understanding that the wealth management personnel servicing impacted clients, including the Individual Defendants, were bound by certain post-employment non-solicitation/non-service obligations.

15.     Choreo Buyer simultaneously rebranded RSM US under the name Choreo.

## Choreo's Client Relationships

16.     Choreo's client relationships are the foundation of its business.  Choreo has spent decades developing and maintaining its client relationships through superior service to its clients, personalized sales practices, and competitive pricing methodologies.

---

[1] Prior to RSM McGladrey, Inc. becoming McGladrey Wealth Management LLC, RSM McGladrey, Inc. converted to RSM McGladrey LLC.

17.     Choreo is the Registered Investment Adviser ("RIA"), and the wealth advisors employed by Choreo are Investment Adviser Representatives.

18.     Individual wealth advisors, such as the Individual Defendants, do not "own" the clients he or she is assigned to service at Choreo.  All client relationships belong to Choreo. Multiple advisors are assigned to service each client on Choreo's behalf.  Importantly, no Choreo employees, including the Individual Defendants, have a contractual relationship with any client.

19.     Instead, all client contracts are between Choreo and the client directly.  Choreo employees, including the Individual Defendants, are merely one of many advisor representatives assigned to these clients over time.

20.     At all times, Choreo is the fiduciary to its clients and investment advisor representatives, such as the Individual Defendants, are merely stewards of Choreo's fiduciary duties of care and loyalty to its clients *during their employment*.  Their fiduciary duties to these clients as Choreo's representatives cease as of the termination of their Choreo employment.

21.     When a client hires Choreo for investment services, the client authorizes Choreo's custodian of record and broker-dealer ("Custodian") to link Choreo to their accounts.  Choreo is then granted authorization for trading and withdrawals by the client.  Therefore, when Choreo provides investment services for its clients, all transactions are coordinated through the Custodian, which acts as Choreo's clearing house.  If, for any reason, Choreo no longer provides investment services for a client, the client can remove Choreo from their Custodian account through a process referred to as "de-linking."

### Choreo's Confidential Information and Trade Secrets

22.     Choreo provides investment advice based on information gathered about each client's individual needs and circumstances.  Choreo develops this client information over the

course of the client relationship and maintains all client information as confidential. This confidential information is not readily available to the public or Choreo's competitors. Even the identities of Choreo's clients are confidential.

23. This client information is critical to the success of the Choreo-client relationship and provides Choreo with the competitive edge needed to effectively service its clients. With its compilations of client information, Choreo has immediate access to information about each client's preferences, goals and needs, allowing it to tailor its services to best achieve a client's objectives.

24. This client confidential information, which is continually developed and refined over time, creates the stickiness in the client relationship. Without an understanding of the information contained in this client confidential information and the goodwill built with these clients over time, it would be very hard for an advisor to entice a client to leave Choreo.

25. The compilation of client information that advisors, such as the Individual Defendants, know about each client is the crux of the client relationship and is consistently utilized by advisors like the Individual Defendants throughout their employment. This information is deeply engrained in the minds of these advisors, even without the information in front of them.

26. There is no way for an advisor to service an existing client without relying upon the client information they know about that client from the years they spent working with them, all of which was made available to them through their employment with Choreo.

27. Choreo derives independent economic value from this client information not being accessible through proper means to competitors who can profit from its use or disclosure.

28. Choreo's client information, including, but not limited to, client identities, addresses, contact information, as well as additional information such as clients' financial data, investment decisions and strategies thereof, and/or securities held by the clients, and other highly

confidential and financial information concerning Choreo's clients, as well as all the compiled assets under management and revenue data associated with Choreo's clients, are trade secrets under the Defend Trade Secrets Act and Iowa Uniform Trade Secrets Act.

**Choreo's Steps to Protect Its Confidential Information and Trade Secrets**

29.     Choreo has expended significant time and resources to develop and maintain its confidential information and trade secrets, which are of great value to any competitor.

30.     Choreo has taken more than adequate measures to maintain the secrecy of this information, including requiring computer access passwords to be used to access Choreo computer systems and records, restricting access to its business premises (or otherwise requiring private and confidential settings if an employee occasionally must work remotely), and having employees, including the Individual Defendants, sign agreements which expressly prohibit the use or disclosure of such information outside of Choreo.

31.     Choreo has also implemented policies and procedures that are aimed at safeguarding its confidential and trade secret information.

32.     Choreo's Employee Handbook, a copy of which is made available to every Choreo employee, including the Individual Defendants, maintains a confidentiality policy which states:

> Upon hire, all Choreo employees are required to sign a legal agreement that includes a confidentiality provision. By commencing and continuing employment with Choreo, employees agree that they will abide by the applicable agreement and not disclose or use any of Choreo's confidential information, either during or after their employment (unless authorized or in the proper course of employment).
>
> The Choreo confidentiality policy applies to our client's information as well. Depending on your role, you may be expected to handle highly confidential client information. Employees may not disclose or use any confidential information of Choreo clients, either during or after their employment (unless authorized or in the proper course of employment), regardless of a client's status as current or former.
>
> Choreo's records and files are confidential and remain the property of the Company. Records and files are not to be disclosed to any outside party without

express permission of the CEO. Confidential information includes, but is not limited to, personnel files, information regarding clients, vendors, or suppliers, or any documents or information regarding Company operations, business and marketing plans, Company financial information, procedures, or practices. Such confidential information may not be removed from the Company premises without express authorization from the CEO.

Confidential information obtained during or through employment may not be used by any employee for the purpose of furthering current or future outside employment or for obtaining personal gain or profit. Choreo reserves the right to avail itself of all legal remedies to prevent impermissible use of confidential information.

This policy is intended to alert employees to the need for discretion at all times and is not intended to inhibit normal business communications.

33. Choreo's Employee Handbook also includes a Conduct and Behavior Policy, which requires all employees to comply with applicable laws and regulations, as well as take steps to secure Choreo's confidential information. The Conduct and Behavior Policy prohibits the following conduct: (1) theft, deliberate or careless damage or destruction of any Company property or the property of any employee or customer, client, or other business partner; (2) removing or borrowing Choreo property without prior authorization; and (3) committing a fraudulent act or breach of trust under any circumstances.

34. The Individual Defendants acknowledged that they had received and read Choreo's Employee Handbook as recently as October 2024.

35. Further, Choreo has adopted an Information Security and Privacy Policy, which applies to all Choreo employees and provides for the following:

**Use and Treatment of Nonpublic Personal Information**

[Employees] should be aware of and sensitive to their treatment of client and prospective client Nonpublic Personal Information. "Nonpublic Personal Information" includes:
- All personally identifiable financial information; and
- Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any

personally identifiable financial information that is not publicly available information.

***[Employees] are prohibited from obtaining, discussing and utilizing Nonpublic Personal Information unless such use is necessary as part of their duties and responsibilities for the Firm.*** Furthermore, [Employees] are required to take precautions to avoid storing Nonpublic Personal Information in plain view in public areas of the Firm's facilities and are required to remove Nonpublic Personal Information from conference rooms, reception areas and other areas where it may be seen by third parties. Particular care should be exercised when Nonpublic Personal Information is discussed in public places where that information may be overheard.

Further, [Employees] must not share Nonpublic Personal Information about the Firm's clients with any third parties or any of the Firm's affiliates without the client's prior affirmative consent unless such disclosure is allowed under the Firm's Privacy Notice. [Employees] should reach out to Compliance with any questions about the Firm's Privacy Notice.

**Privacy Notices**

[Employees] who are responsible for onboarding new clients must provide prospective clients with a Privacy Notice prior to entering into a Services Agreement with the new client and must maintain a log of such delivery.
On an annual basis, Compliance will review the Firm's Privacy Notice, make any necessary updates, and provide the updated version to Operations for distribution to all clients.

**Location and Maintenance of Client Information**

***Client information retained in accordance with the Firm's Books and Records Policy are maintained in a secure location with limited access and periodically tested by Compliance. In the case of all such client information, limited access will be granted to only those who require such information in the course of their specific job responsibilities. Upon the separation of an employee, the Firm ensures that the former employee's systems access is deactivated.*** (Emphasis added.)

36.     Choreo also maintains an Electronic Communications Policy, which applies to all

Choreo employees and provides the following:

**Use of Personal Devices**

Supervised Persons are prohibited from using their personal computer to conduct Firm business unless the Supervised Person utilizes a Firm sponsored cloud-based provider or any additional software applications as directed by IT. Supervised

Persons must ensure their cellphones have the proper security applications installed as directed by the Firm's IT department.

**Privileged and Confidential Electronic Communication**

Supervised Persons must ensure that information contained within Electronic Communications is disclosed only to authorized individuals. Supervised Persons must exercise care to protect proprietary and/or confidential information of the Firm and its clients. Unauthorized review, transmission and/or disclosure of any confidential or proprietary information is strictly prohibited. This includes messages received from or sent to the Firm's legal counsel and regulatory consultants. In the context of the Firm's ordinary course of business, care should be exercised to protect privilege between legal counsel and the Firm to the extent possible.

**Sending Non-Public Information (NPI) via e-mail**

Supervised Persons should always truncate account numbers and SSNs and must not transmit private information via the internet without first encrypting it. Before sending information via email, Supervised Persons must determine if the information sent would trigger the data privacy rule and thus require encryption. Generally, encryption is necessary if the information being transmitted includes a client's last name and another piece of personally identifiable information (e.g., last name and SSN, last name and address, last name and drivers' license number).

When sending an e-mail or an e-mail with an attachment containing two or more data elements, Supervised Persons must encrypt it via secure e-mail by typing **SECURE:** in front of the subject line. Supervised Persons should also password protect any attachments containing private information and separately provide the password. Mimecast can also be used to send encrypted emails.

If a Supervised Person inadvertently sends business-related Electronic Communications to the wrong recipient, they should promptly report the incident to Advisory Operations (or to Compliance in the event the Supervised Person is a member of the National team), even if the consequences of the mistaken transmission appear minimal. The Supervised Person should highlight to Advisory Operations or Compliance if the mistaken transmission may have contained confidential non-public information or material information that is proprietary to the Firm. Advisory Operations or Compliance will gather information from the Supervised Person and report the incident to the Firm's IT department.

37.     Additional measures taken by Choreo include training its employees concerning

their obligations to protect confidential and trade secret information, including client information.

38.     In addition, Choreo's computer network and e-mail systems are designed to flag outgoing emails that contain certain sensitive information. Choreo also blocks employees from using removable storage devices (such as thumb drives), web-based file sharing services (such as Dropbox,) and web-based personal email on work desktop and laptop computers.

### Lors' Employment

39.     Lors commenced employment with RSM US on May 1, 2016, working out of RSM US's office in Des Moines, Iowa.

40.     In exchange for his employment and continued employment with RSM US, access to new confidential information, substantial compensation, career advancement and professional opportunities with RSM US, and later Choreo, Lors executed an Employment Agreement dated July 28, 2016 (the "Lors Employment Agreement"). The Lors Employment Agreement includes post-employment limitations on soliciting, diverting and/or servicing certain clients ("Covered Clients"), as quoted below in paragraphs 69-70. A true and complete copy of the Lors Employment Agreement is attached as Exhibit 1.

41.     As a Senior Wealth Advisor with Choreo, Lors' job duties primarily consisted of managing the comprehensive needs of the specific Choreo clients whom he was assigned to service. Lors' responsibilities also included being the primary contact for the client and their service needs, delivering financial services, and investment management oversight. Lors was responsible for, among other things, developing and maintaining client relationships for Choreo's benefit.

42.     While employed with Choreo, Lors advanced into the role of Managing Director of Wealth Management in the Des Moines office. In that role, Lors was also responsible for

developing broader business strategies, managing expenses and maximizing the profitability of the Des Moines office.

43.     While Lors acted as the primary wealth advisor for many clients, and had direct access to critical information regarding their investment needs and plans, he did not originate the vast majority of those clients.

44.     Indeed, of the 100 clients that Lors serviced as of the date he left Choreo, 67 of those client relationships are attributable to the work of another departed Choreo advisor.  From an annual revenue perspective, approximately 79% of the revenue from clients Lors was assigned to service is attributable to the work of another departed Choreo advisor.

45.     Lors also had a team of advisors and advisory personnel to support the needs of each Choreo client he was assigned to service.

### Schomer's Employment

46.     Schomer was hired by RSM US on February 5, 2004, working out of RSM US's office in Des Moines, Iowa.

47.     In exchange for his employment and continued employment with RSM US, access to new confidential information, substantial compensation, career advancement and professional opportunities with RSM US, and later Choreo, Schomer executed an Employment Agreement dated February 5, 2004 with RSM McGladrey, Inc. (the "Schomer Employment Agreement").  The Schomer Employment Agreement includes post-employment limitations on soliciting, diverting and/or servicing Covered Clients, as quoted below in paragraphs 71-72.  A true and complete copy of the Schomer Employment Agreement is attached as Exhibit 2.

48.     As a Senior Wealth Advisor with Choreo, Schomer's job duties primarily consisted of managing the comprehensive needs of the specific Choreo clients whom he was assigned to

service.  Schomer's responsibilities included being the primary contact for the client and their service needs, delivering financial services, and investment management oversight.  Schomer was responsible for, among other things, developing and maintaining client relationships for Choreo's benefit.

49.    While employed with Choreo, Schomer advanced into the role of Managing Director of Wealth Management in the Des Moines office.  In that role, Schomer was also responsible for developing broader business strategies, managing expenses and maximizing the profitability of the Des Moines office.

50.    While Schomer acted as the primary wealth advisor for many clients, and had direct access to critical information regarding their investment needs and plans, he did not originate the vast majority of those clients.

51.    Indeed, of the 86 clients that Schomer serviced as of the date he left Choreo, 67 of those client relationships are attributable to the work of another departed Choreo advisor.  From an annual revenue perspective, approximately 90% of the revenue from clients Schomer was assigned to service is attributable to the work of another departed Choreo advisor.

52.    Schomer also had a team of advisors and advisory personnel to support the needs of each Choreo client he was assigned to service.

**Scheer's Employment**

53.    Scheer was hired by RSM US on September 27, 2010, working out of RSM US's office in Des Moines, Iowa.

54.    In exchange for her employment and continued employment with RSM US, access to new confidential information, substantial compensation, career advancement and professional opportunities with RSM US, and later Choreo, Scheer executed an Employment Agreement dated

September 27, 2010 (the "Scheer Employment Agreement"). The Scheer Employment Agreement includes post-employment limitations on soliciting, diverting and/or servicing Covered Clients, as quoted below in paragraphs 69-70. A true and complete copy of the Scheer Employment Agreement is attached as Exhibit 3.

55.     As a Senior Director of Wealth Management, Scheer's job duties primarily consisted of managing the comprehensive needs of the specific Choreo clients whom she was assigned to service. Scheer's responsibilities included being the primary contact for the client and their service needs, delivering financial services, and investment management oversight. Scheer was also responsible for, among other things, developing and maintaining client relationships for Choreo's benefit.

56.     While Scheer acted as the primary wealth advisor for many clients, and had direct access to critical information regarding their investment needs and plans, she did not originate the vast majority of those clients.

57.     Indeed, of the 59 clients that Scheer serviced as of the date she left Choreo, 50 of those client relationships are attributable to the work of another departed Choreo advisor. From an annual revenue perspective, approximately 94% of the revenue from clients Scheer was assigned to service is attributable to the work of another departed Choreo advisor.

58.     Scheer also had a team of advisors and advisory personnel to support the needs of each Choreo client she was assigned to service.

### O'Neil's Employment

59.      O'Neil was hired by RSM US in May 2020, working out of RSM US's office in Des Moines, Iowa.

60.     In exchange for her employment and continued employment with RSM US, access to new confidential information, substantial compensation, career advancement and professional opportunities with RSM US, and later Choreo, O'Neil executed an Employment Agreement dated May 20, 2020 (the "O'Neil Employment Agreement" and together with the Lors Employment Agreement, Schomer Employment Agreement and Scheer Employment Agreement, the "Employment Agreements").  The O'Neil Employment Agreement includes post-employment limitations on soliciting, diverting and/or servicing Covered Clients, as quoted below in paragraphs 69-70.  A true and complete copy of the O'Neil Employment Agreement is attached as Exhibit 4.

61.     As a Senior Advisor of Wealth Management with Choreo, O'Neil's job duties primarily consisted of managing the comprehensive needs of the specific Choreo clients whom she was assigned to service.  O'Neil's responsibilities included being the primary contact for the client and their service needs, delivering financial services, and investment management oversight. O'Neil was also responsible for, among other things, developing and maintaining client relationships for Choreo's benefit.

62.     While O'Neil acted as the primary wealth advisor for many clients, and had direct access to critical information regarding their investment needs and plans, she did not originate the vast majority of those clients.

63.     Indeed, of the 104 clients that O'Neil serviced as of the date she left Choreo, 73 of those client relationships are attributable to the work of another departed Choreo advisor.  From an annual revenue perspective, approximately 86% of the revenue from clients O'Neil was assigned to service is attributable to the work of another departed Choreo advisor.

64.     O'Neil also had a team of advisors and advisory personnel to support the needs of each Choreo client she was assigned to service.

**The Employment Agreements**

65.     Each of the Individual Defendants' Employment Agreements is to be "interpreted and governed by the laws of the State of Minnesota without reference to its conflicts of laws rules." Ex. 1 at ¶ 13; Ex. 2 at ¶ 11; Ex. 3 at ¶ 13; Ex. 4 at ¶ 13.

66.     The Employment Agreements contain certain post-employment restrictive covenants that the Individual Defendants agreed to in exchange for initial and continued employment, access to confidential information, substantial compensation, career advancement and professional opportunities with Choreo, including confidentiality, non-solicitation and non-service of Covered Clients and non-solicitation of Choreo employees (the "Restrictive Covenants").

67.     Paragraph 6 of each of the Individual Defendant's Employment Agreements prohibits the Individual Defendants from using trade secrets or other "Confidential Information" that he/she learned or obtained through his/her employment:

> I acknowledge that as a result of my employment by [Choreo], I will be given access to certain trade secrets and Confidential Information (defined herein) pertaining to the property, business, and operations of [Choreo], its affiliates, clients and certain Other Parties. In consideration of my employment or continued employment and my access to such trade secrets and Confidential Information, I agree that I shall not at any time or in any manner, directly or indirectly, during or after my employment with [Choreo], use or disclose to any party other than [Choreo] and its affiliates any trade secrets or other Confidential Information that I learned or obtained while an employee of [Choreo] or any of its predecessors.

Exs. 1-4 at ¶ 6.

68.     "Confidential Information" is defined in the Employment Agreements to include information disclosed to or known by the Individual Defendant as a consequence of his/her "position with [Choreo] or any of its affiliates or predecessors and not generally known in the industry in which [Choreo] is engaged, including, but not limited to, client information." *Id.*

-15-

69.     Paragraph 7 of the Lors, Scheer and O'Neil Employment Agreements prohibits them

from soliciting or servicing Covered Clients for one year following the termination of his/her

employment:

> In consideration of my employment or continued employment by [Choreo] and
> access to the Confidential Information, and in consideration of the unique
> knowledge, skill and training and to which I will be given access as an employee
> of [Choreo], I agree that throughout my employment with [Choreo] and for a one-
> year period following voluntary or involuntary termination of my employment, I
> will not for myself or others, either directly in my individual capacity or indirectly
> as an employee, associate, independent contractor or agent of another, solicit,
> divert, take away or conduct any financial planning, financial consulting,
> investment advisory, securities brokerage or insurance business with, or attempt to
> solicit, divert, take away or conduct any financial planning, financial consulting,
> investment advisory, securities brokerage or insurance business with, any [Covered
> Clients].

Exs. 1, 3, and 4 at ¶ 7.

70.     Covered Clients are defined to include:

(i)     Any client(s), customer(s) or account(s) or prospective client(s),
        customer(s) or account(s) serviced, counseled, opened or introduced by
        [Individual Defendant] on behalf of [Choreo] . . . during the two-year period
        prior to the effective date of [his] termination; and

(ii)    Any client(s), customer(s) or account(s) or prospective client(s),
        customer(s) or account(s) of [Choreo] . . . about which [Individual
        Defendant] gained any business information in [his/her] capacity as an
        employee of [Choreo] at any time during the two-year period prior to
        termination of [his/her] employment.

*Id*.

71.     Similarly, Paragraph 7 of the Schomer Employment Agreement prohibits him from

soliciting or servicing Covered Clients for two years following the termination of his employment:

> In consideration of my employment or continued employment by [Choreo] and
> access to the Confidential Information, and in consideration of the unique
> knowledge, skill and training and to which I will be given access as an employee
> of [Choreo], I agree that throughout my employment with [Choreo] and for a two-
> year period following voluntary or involuntary termination of my employment, I
> will not for myself or others, either directly in my individual capacity or indirectly
> as an employee, associate, independent contractor or agent of another: (i) solicit,

divert or take away or attempt to solicit, divert or take away any [Covered Clients]; or (ii) Provide to any [Covered Client] services or products similar to products or services offered by [Choreo] to its clients. Notwithstanding anything to the contrary in this paragraph 7, I understand that I am permitted to work for a [Covered Client] unless such employment would impair the independence of [Choreo] or any Other Party.

Ex. 2 at ¶ 7.

72.     Covered Clients are defined in the Schomer Employment Agreement to include:

(i)     Any client, customer or account that was serviced or counseled by [Schomer] during the two-year period prior to the effective date of [his] termination; and

(ii)    Any client, customer or account of [Choreo's] or any predecessor of [Choreo's] about whom [Schomer] gained any business information in my capacity as an employee of RSM at any time during the two-year period prior to termination of my employment.

*Id.*

73.     Paragraph 8 of the Lors, Scheer and O'Neil Employment Agreements prohibits them from soliciting, or attempting thereto, any employee of Choreo for two years following the termination of his/her employment:

In consideration of my employment or continued employment by RSM US, I agree that while I am employed by RSM US and for a period of two years following the voluntary or involuntary termination of my employment with RSM US, I will not directly or indirectly solicit, attempt to solicit, or in any manner encourage any employee of RSM US to leave RSM US.  I will not during the same two-year period offer employment or aid anyone else in offering employment (whether as an employee or contractor) to any employee of RSM US, without RSM US's prior written consent.

Exs. 1, 3, and 4 at ¶ 8.

74.     Similarly, Paragraph 8 of the Schomer Employment Agreement states:

In consideration of my employment or continued employment by RSM, I agree that while I am employed by RSM and for a period of two years following the voluntary or involuntary termination of my employment with RSM, I will not solicit or in any manner encourage any employee of RSM to leave RSM's employ.  I will not during the same two-year period offer employment or aid anyone else in offering

employment (whether as an employee or contractor) to any employee of RSM, without RSM's prior written consent.

Ex. 2. at ¶ 8.

75.     The Employment Agreements provide for certain remedies in the event of a breach. Each of the Individual Defendants acknowledged in their respective Employment Agreement that injunctive relief is appropriate for any violations of Paragraphs 6 and 7 of the Employment Agreement (and Paragraph 8, as it pertains to the Schomer Employment Agreement).

76.     The Lors, Scheer and O'Neil Employment Agreements also entitle Choreo, at its discretion, to certain liquidated damages stemming from a violation of the customer non-solicitation and non-service restriction:

> Employee further agrees that, to the extent that injunctive relief does not remedy the harm resulting from any violations of Paragraphs 6 or 7, [Choreo] may seek actual money damages or any other remedies available to it at law. In lieu of actual money damages, Employee agrees that [Choreo], in its discretion, may seek liquidated damages determined as follows: 100% of the gross revenue applicable to each client, customer or account that is the subject of any violations of Paragraphs 6 or 7 and paid or payable for the month prior to Employee's termination, times twelve (x 12) to arrive at estimated annualized revenue, and times two hundred and fifty percent (x 250%).

Exs. 1, 3 and 4 at ¶ 9.

77.     The Schomer Employment Agreement similarly provides for liquidated damages:

> Because actual damages would be impossible to ascertain and calculate, [Schomer] agree[s] that for any violations of paragraph 6, [Schomer] will be liable for liquidated damages of 100% of the net services rendered by [Choreo] or any predecessor or affiliate of [Choreo], during the one-year period prior to each breach of this paragraph 6, for each client, customer or account that is the subject of any violations of this paragraph 6.
> …
> Because actual damages would be impossible to ascertain and calculate, [Schomer] agree[s] that for any violations of paragraph 7, [Schomer] will be liable for liquidated damages of 100% of the net services rendered by [Choreo] or any predecessor or affiliate of [Choreo], during the one-year period prior to each breach of this paragraph 7, for each client, customer or account that is the subject of any violations of this paragraph 7.

Ex. 2 at ¶¶ 6, 7.

78.     Moreover, the Schomer Employment Agreement provides for liquidated damages in the event of a breach of Paragraph 8, as it applies to the solicitation of Choreo's employees:

> I agree to liquidated damages of 50% of the annual compensation for the 12-month period immediately prior to such person's termination of employment with RSM for each RSM employee to whom I either offer employment (whether as an employee or contractor) or directly or indirectly influence others to offer employment (whether as an employee or contractor) without the prior written consent of RSM.

*Id.* at ¶ 8.

79.     As set forth in the Lors, Scheer and O'Neil Employment Agreements, liquidated damages are "not [to] be construed as payment to avoid [Individual Defendant]'s obligations under Paragraphs 6 or 7 or as an alternative performance to the obligations under Paragraphs 6 or 7, and that [Choreo] may seek injunctive relief to preclude violations of Paragraphs 6 or 7." Ex. 1, 3, and 4 at ¶ 9. While not explicitly stated, the same is true for the Schomer Employment Agreement.

80.     Liquidated damages are not Choreo's exclusive monetary remedy for a breach of Restrictive Covenants in the Employment Agreements.

81.     In addition to monetary damages, Choreo is also entitled to recover its costs, attorneys' fees and litigation expenses incurred in pursuing enforcement of the Restrictive Covenants set forth in the Employment Agreements. Exs. 1, 3 and 4 at ¶ 10; Ex. 2 at ¶ 6.

### The Individual Defendants' Coordinated Resignation
### from Choreo and Move to Compound

82.     On January 30, 2025, each Individual Defendant informed Choreo that he/she was resigning, effective February 27, 2025. Put simply, all lead wealth managers of Choreo's Des Moines, Iowa office resigned at the same time. Collectively, they were responsible for overseeing all of the business serviced by the Des Moines office.

83.     Shortly after providing notice of their resignations, the Individual Defendants informed Choreo that they all would be joining Compound.

84.     Compound is a direct competitor of Choreo.  Like Choreo, Compound is a national wealth management firm, and offers its clients investment management and financial planning services, like Choreo.

85.     Recognizing that the Individual Defendants were leaving Choreo for a direct competitor, Choreo sent letters to each Individual Defendant on Monday, February 3, 2025, reminding them of the Restrictive Covenants contained in the Employment Agreements to which they are bound (the "February 3 Letters".)

86.     The February 3 Letters demanded that the Individual Defendants confirm that they intend to abide by the obligations in their Employment Agreements by February 6, 2025.

87.     As of the date of this Verified Complaint, no Individual Defendant has provided the requested assurances.

88.     On February 26, 2025, the Individual Defendants' second to last day of employment, Choreo sent another letter to the Individual Defendants reminding them of their post-employment obligations and providing them with a copy of their Employment Agreements.

89.     Among other things, the February 26, 2025 letters informed the Individual Defendants that:  (i) any contact with Covered Clients following the end of their employment would be considered unlawful solicitation under the Employment Agreement; (ii) providing services to any Covered Clients would be considered a violation of the Employment Agreement; and (iii) on or before February 27, 2025 they must delete all of Choreo's confidential information, including client contact and other client information, from any personal electronic devices (or those belonging to Compound to the extent they had provided Compound with this information)

without retaining any copies thereof and return any non-electronic Choreo document to Choreo without retaining copies thereof.

90.     On information and belief, Compound's counsel, who also represents the Individual Defendants, received copies of these letters from the Individual Defendants, putting Compound on notice of the Restrictive Covenants.

91.     Separate from this litigation, Compound is well aware of the contractual obligations contained in the Employment Agreements and with Choreo employees generally.  Indeed, Choreo just recently resolved litigation involving a nearly identical agreement to the Lors, Scheer and O'Neil Employment Agreements with another employee who left Choreo to join Compound and allegedly violated his restrictive covenant obligations.

92.     After submitting their notices of resignation, two fellow Managing Directors met with Schomer and Lors to discuss their resignation and offer to help with the transition of the Choreo clients that had been assigned to Schomer and Lors.  In this meeting, Schomer and Lors stated that one of the most appealing parts of Compound's offer was that they would *own their own book of business*, meaning that if Schomer and/or Lors ever left Compound, they could take their book of business with them.

93.     Implicit in Schomer and Lors' attraction to Compound's offer is an acknowledgment that Schomer and Lors understand they do not "own" their current book of business, such that they cannot legally bring Covered Clients with them in their move to Compound.

**Choreo's Efforts to Facilitate a Smooth Transition and Retain Clients**

94.　Immediately after receiving the Individual Defendants' notices of resignation, Choreo began working to protect its business, retain its clients and facilitate a smooth transition of the affected Choreo clients to new wealth advisors.

95.　Specifically, Choreo immediately sent a team of executives and senior managers to the Des Moines office to reassure the remaining employees that their jobs were safe and discuss a plan moving forward.

96.　This included working to reassign the clients serviced by the Individual Defendants to new senior advisors, while maintaining the current team of junior advisors and operations personnel with whom the clients were already familiar.　By February 7, 2025, Choreo had identified new senior advisors for each affected client.

97.　On February 3, 2025, Choreo provided guidance to the Individual Defendants about its expectations of these individuals during their notice period.

98.　Among other things, Choreo reminded the Individual Defendants of their ongoing fiduciary duties to Choreo, asked the Individual Defendants to work from home unless otherwise instructed and reminded the Individual Defendants that they should not be communicating with employees about their departure for Compound in a manner that would violate their Restrictive Covenants.

99.　With respect to clients, Choreo instructed the Individual Defendants that they were not to speak to any clients without another approved individual present nor should they inform clients of their resignation.　Instead, Choreo informed the Individual Defendants that Choreo would coordinate those communications and may ask the Individual Defendants to participate in calls to transition these clients to a new advisor.　Choreo also instructed the Individual Defendants to make

sure all client files were up to date and organized and that all records on Choreo's CRM software and other databases were complete.

100.    None of the Individual Defendants responded to Choreo's email with this guidance.

101.    In early February, Choreo began informing Covered Clients of the Individual Defendants' departures and introducing the clients to their new senior advisor.  Choreo also reassured each Covered Client that they would continue to be well serviced following the departure of the Individual Defendants.

102.    On February 21, 2025, Choreo also presented each of the Individual Defendants with a Certification of Exit Obligations ("Certifications").  Choreo asked that the Certifications be returned by February 24, 2025.

103.    Relevant here, the Certifications sought confirmation that the Individual Defendants had returned all Choreo property, including client information stored electronically on personal devices.  The Certifications specifically requested confirmation that the Individual Defendants had deleted all client contact information from their personal devices without retaining copies thereof.  Further, the Certifications requested confirmation that the Individual Defendants intend to abide by their contractual obligations to Choreo, including specifically their Restrictive Covenants.

104.    On February 27, 2025, the Individuals Defendants returned signed copies of the Certifications.

**The Individual Defendants' Breach of Their Employee Non-Solicitation Obligations, Tortious Interference with Each Other's Contractual Obligations and Aiding and Abetting Each Other's Breach of Fiduciary Duties**

105.    The Individual Defendants have breached the employee non-solicitation obligations in the Employment Agreements.

106.    The mass resignation of the Individual Defendants makes clear that the Individual Defendants coordinated their resignations from Choreo with one another.  In other words, they

directly and/or indirectly solicited and/or encouraged each other to leave Choreo in violation of each of their employee non-solicitation obligations in their respective Employment Agreements.

107.    One needs to look no further than the Individual Defendants' announcements on their publicly available LinkedIn profiles to find confirmation that their move from Choreo to Compound was coordinated.   On Monday, March 3, 2025, each of the Individual Defendants posted a variation of the following message posted by Schomer (identifying by name the other Individual Defendants):

> Exciting news! I've joined @Compound as a Principal & Senior Wealth Advisor, opening a new office in Des Moines alongside Joleen Scheer, CFP®, Lindsey O'Neil, CFP®, CPA, and Kevin Lors, CPA, CFP®, MTax.

> We've worked together for years, providing thoughtful financial planning and personalized advice, and now we're bringing that experience to Compound. With access to cutting-edge technology and a client-first approach, we're even better positioned to serve our clients.

108.    The Individual Defendants' actions thus far have harmed Choreo by destabilizing its workforce and depriving it of critical employees.

109.    The Individuals Defendants also tortiously interfered with each other's contractual obligations, of which they were fully aware at the time they coordinated their departure from Choreo, by encouraging each other to leave Choreo in favor of Compound and disclosing Choreo's confidential information to Compound.   These actions also breached their fiduciary duties of loyalty to Choreo and aided and abetted each other in doing the same.

**The Individual Defendants' Breaches of Their Fiduciary Duties to Choreo**

110.    By soliciting and encouraging each other to leave Choreo in favor of another employer, the Individual Defendants acted in their own self-interest, and in Compound's interest,

rather than the best interest of Choreo.  In doing so, the Individual Defendants breached their fiduciary duties of loyalty to Choreo.

111.    Moreover, on information and belief, in discussions with Compound, the Individual Defendants shared Choreo's confidential information with Compound about, at least, Covered Clients, the assets under management and the revenue generated from those clients.  Further supporting this conclusion, a March 4, 2025 article on BusinessWire, discussing the Individual Defendants' move to Compound, references Compounding having "add[ed] [a] $1.2 billion advisor team."  *See* https://www.businesswire.com/news/home/20250304492658/en/Compound-Planning-Grows-to-3-Billion-in-AUM-Adds-1.2-Billion-Advisor-Team (last visited Mar. 4, 2025).  Compound would not have been able to advertise that the Individual Defendants oversaw $1.2 billion in assets under management in the BusinessWire article if the Individual Defendants had not shared this confidential information with Compound.  The Individual Defendants' sharing of Choreo's confidential information with a competitor during their employment with Choreo further violated their fiduciary duties to Choreo.

**The Individual Defendants' Misuse of Choreo's Confidential Information**

112.    As discussed above, Choreo is informed and believes that the Individual Defendants shared Choreo confidential information with Compound while exploring the opportunity to work with Compound.

113.    The Individual Defendants had no authorization to share this information with anyone outside of Choreo, let alone a direct competitor.

114.    In doing so, the Individual Defendants breached their respective confidentiality obligations contained in the Employment Agreements.

115.   Moreover, given the Individual Defendants' solicitation of Covered Clients so far, as discussed below, and efforts to continue servicing those clients at Compound, it is inevitable that the Individual Defendants will use and disclose Choreo's confidential information and trade secrets in their employment with Compound.

<strong>The Individual Defendants' Breaches of Their<br>Client Non-Solicitation and Non-Service Obligations</strong>

116.   Since leaving Choreo on February 27, 2025, the Individual Defendants have, on information and belief, been communicating with Covered Clients about their departure from Choreo and their new employment with Compound Planning.

117.   The Individual Defendants' actions are designed to solicit Covered Clients to discontinue their work with Choreo and commence working with the Individual Defendants at Compound Planning.

118.   Moreover, in their respective LinkedIn posts announcing their new employment with Compound, the Individual Defendants invited people in their network to connect with them by providing their Compound email address and/or a direct link to their calendars.

119.   The Individual Defendants are, on information and belief, connected to many Covered Clients on LinkedIn, such that these posts were designed to solicit Covered Clients to leave Choreo and work with the Individual Defendants at Compound.

120.   Indeed, Choreo actively encourages its advisors to use social media, such as LinkedIn, to advance client relationships.   The Social Media Policy in Choreo's Employee Handbook states, in relevant part:

> Choreo's Social Media Policy is intended to advance the Choreo brand and empower personnel to participate in social media for business purposes while upholding Choreo's reputation. Using social media positively may help to build and engage a network, communicate about Choreo, increase knowledge of business issues, and lead to business development and/or recruitment opportunities.

121.    The Individual Defendants' actions, as described above, constitute solicitation and attempted solicitation in violation of the Restrictive Covenants.

122.    Additionally, in just the three (3) business days since the Individual Defendants left Choreo, four (4) Covered Clients have given 30-days' notice to Choreo that they are terminating their relationship with Choreo.

123.    One of the Covered Clients, Client A, explicitly told Choreo that he intends to commence working with Lors at Compound Planning.  Client A has been a Choreo client since 2015, one year before Lors commenced employment with Choreo.

124.    Another Covered Client, Client B, stated that she cannot handle the change associated with meeting a new advisor, insinuating that she intends to commence working with Scheer at Compound Planning.  Client B has been a Choreo client since 2008, years before Scheer commenced employment with Choreo.

125.    The other two departed Covered Clients, Clients C and D, have been at Choreo since 2009 and 2013, respectfully.

126.    The long tenure of these Covered Clients with Choreo make clear that their notice of termination just days after the Individual Defendants left Choreo, is no coincidence.

127.    In their emails to Choreo, each Covered Client provided Choreo with thirty (30) days' notice of their intent to terminate their relationship with Choreo, asking that Choreo de-link them at the end of the notice period.  This is unusual.  In Choreo's experience, clients rarely provide the required notice to Choreo, as most clients are unaware of the contractual provision requiring such notice.  On information and belief, the Individual Defendants have coached these Covered Clients about how to terminate their relationship with Choreo, in further violation of the Restrictive Covenants.

128.    The thirty (30) day notice also appears to be a carefully planned and coordinated effort to deprive Choreo of direct evidence of the Individual Defendants' servicing of Covered Clients.  In Choreo's recent legal dispute involving another advisor who left to join Compound (discussed below), clients immediately de-linked from Choreo and moved their assets to Compound Planning.  As a result of those actions, Choreo was able to immediately see, through its Custodian, where the clients' money went.  By providing thirty (30) days' notice of termination and having Choreo de-link the Covered Clients, Choreo will be deprived of the ability to see where these Covered Clients' assets ultimately go.  Choreo is informed and believes that the Individual Defendants coached Covered Clients to give thirty (30) days' notice, rather than directly transferring assets to the Individual Defendants at Compound, to conceal direct evidence of their solicitation and servicing of these Covered Clients.

129.    After learning of these client termination notices, on March 3, 2025, Choreo's counsel sent a letter to counsel for Defendants.  The letter notified counsel of these client departures and of Choreo's reason to believe that these clients were planning to work with the Individual Defendants at Compound.  The letter requested that Defendants' counsel inform Choreo no later than 5:00 p.m. CT if the Individual Defendants planned to service these Covered Clients at Compound, and made clear that Choreo would interpret a failure to respond to mean that the Individual Defendants intend to breach their obligations.

130.    As of the date this Complaint was filed, counsel for Defendants has not responded to this letter.

131.    One (1) additional client, Client E, did not explicitly provide thirty (30) days' notice, but made clear that he was moving his account to O'Neil at Compound.  He said: "I will be ending services with Choreo and will be moving my accounts to Lindsey O'Neil's new company."

132.    In addition to the five (5) clients who have already provided notice of termination to Choreo, another four (4) clients have informed Choreo that they intend to leave Choreo to commence working with the Individual Defendants at Compound.  These clients have been clients of Choreo for anywhere from six (6) to twenty-two (22) years.

133.    In light of the above, Choreo is informed that the Individual Defendants intend to accept the business of these Covered Clients.  Covered Clients would not leave Choreo to work with the Individual Defendants if they were not informed that the Individual Defendants would agree to accept their business.

134.    Moreover, the March 4 BusinessWire article, referring to the Individual Defendants, the article states that Compound "add[ed] [a] $1.2 billion advisor team."  *See*, https://www.businesswire.com/news/home/20250304492658/en/Compound-Planning-Grows-to-3-Billion-in-AUM-Adds-1.2-Billion-Advisor-Team (last visited Mar. 4, 2025).  The article also addresses Compound's growth in assets under management in conjunction with the discussion of the $1.2 billion book of business serviced by the Individual Defendants at Choreo.

135.    In the same article, Lors commented, "Compound will empower each of us to ***continue offering our clients*** holistic counsel, but also equip us with new resources to elevate our services."  *Id*. (emphasis added).  This statement clearly indicates that the Individual Defendants intend to accept the business of the Covered Clients they serviced at Choreo.

136.    Given the above facts, it is clear that the Individual Defendants plan to violate, and to continue to violate, their client non-service obligations and, on information and belief, have already attempted to do so (also in violation of the Restrictive Covenants) by informing these Covered Clients that they will commence to working with them at Compound.

137.   Choreo's knowledge of the Individual Defendants' intent to violate the Restrictive Covenants is only bolstered by Choreo's recent history with Compound (as discussed below), its knowledge of Compound's actions in other cases (also discussed below), the Individual Defendants' failure to provide assurance of their intent to abide by the Restrictive Covenants and the Individual Defendants' breaches of the Restrictive Covenants to date.  Based on these events, it is clear that the Individual Defendants have no respect for their contractual obligations and, unless enjoined, will continue breaching the Restrictive Covenants following their departure from Choreo on February 27, 2025.

**Compound's Tortious Interference and Aiding and Abetting
the Individual Defendants' Breach of Legal Obligations to Choreo**

138.   Compound is aware of the Individual Defendants' Restrictive Covenants, as Compound has poached former Choreo employees in the past and has received written communications from Choreo, similar to the February 3 Letter, instructing it to cease its unlawful interference with the contracts of Choreo's employees.

139.   For example, mere months before poaching the Individual Defendants, Compound engaged in similar unfair business practices by poaching another employee of Choreo's who was bound by a nearly identical employment agreement and permitting him to immediately violate those restrictions for Compound's benefit.

140.   Targeting wealth advisors and groups of wealth advisors who are bound by contractual restrictions on their ability to solicit and service clients is a deliberate recruitment strategy of Compound.

141.   Indeed, Compound's CEO has made public that his primary approach to growing Compound's business is by poaching advisors from firms, who in turn would be expected to bring

their book of business to Compound. *See, e.g.*, https://www.fa-mag.com/news/compound--alternativ-wealth-merge--form-compound-planning-74602.html (last visited Mar. 4, 2025).

142. Compound has implemented this strategy continuously over the last 12 months.

143. In early 2024, Compound poached 12 advisors at the same time from Empower Annuity Insurance Company of America, Empower Advisory Group, LLC and Empower Retirement, LLC, and, on information and belief, induced these advisors to immediately breach their client-based restrictions. This case resulted in a Stipulated Preliminary Injunction and ultimately settled shortly thereafter.

144. Next, around October 2024, Compound poached a Senior Director from Choreo's Charlotte, North Carolina office and, on information and belief, induced that advisor to violate his contractual commitments to Choreo. A Delaware court ultimately entered an injunction barring that advisor from further breaches of his restrictive covenants, but not before the advisor successfully moved a large number of the clients he had serviced at Choreo to Compound.

145. Indeed, in that case, the departing advisor, on Compound's behalf, continued to solicit Choreo clients and accepted business from 12 additional Choreo clients between the time Choreo filed its Motion for Temporary Restraining Order and the Delaware court's entry of a temporary restraining order, demonstrating that even in the face of an impending injunction, Compound sought to maximize the unlawful client conversions before the court could put a stop to it.

146. Since that time, Compound has been targeting Choreo advisors in an effort to have them depart Choreo in favor of Compound and flout their restrictive covenant obligations. Indeed, on information and belief, Compound entices potential advisors with an offer to retain 50% of the revenue from "their" existing book of business plus other incentives, despite knowing that those

advisors are barred from soliciting or servicing Covered Clients for a period of time following their employment with Choreo.

147.    Despite the history of litigation and repeated injunctions, Compound appears undeterred and continues to engage in unfair business practices and tortious interference with Choreo's contractual relationships with its current and former wealth advisors.

148.    Here, Compound, on information and belief, lured the Individual Defendants with the promise of earning 50% of their annual revenue based on the book of business that they were assigned to service at Choreo. Compound made this offer knowing that the Individual Defendants are contractually barred from bringing their book of business to Compound.

149.    Compound also induced the Individual Defendants to solicit and encourage one another, and others, to join Compound, knowing that this solicitation violated the Individual Defendants' respective employee non-solicitation obligations and breached their fiduciary duties to Choreo.

150.    Compound also induced the Individual Defendants to share Choreo's confidential information with Compound, including client information, assets under management and revenue data, knowing that doing so would interfere with the Individual Defendants' non-disclosure obligations and force the Individual Defendants to breach their fiduciary duties to Choreo.

151.    Simply put, Compound has made it clear that it seeks to grow not through fair and lawful competition, but through bad faith and interference with contractual obligations.

## COUNT I – TRADE SECRET MISAPPROPRIATION; DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831 *et seq.*)

### *(Against All Defendants)*

152.    Choreo incorporates the paragraphs above as though fully restated herein.

153. Choreo's client information, described in greater detail above, constitute "trade secrets" within the meaning of the federal Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*, because Choreo derives independent economic value from this information, such information is not generally known nor readily ascertainable by proper means by others who could obtain economic value from its disclosure or use, and Choreo has exercised reasonable efforts to maintain the secrecy and confidentiality of such information.

154. The Individual Defendants have misappropriated and inevitably will continue to improperly use, disclose and/or misappropriate Choreo's trade secrets for their own benefit and/or that of Compound, and to inflict commercial harm on Choreo by soliciting clients with such information and giving that information to Compound, a direct competitor of Choreo's, for Compound's unfair exploitation.

155. Compound is vicariously liable for the Individual Defendant's unlawful conduct as the Individual Defendants used, disclosed and/or misappropriated Choreo's trade secrets for the benefit of Compound and as agents of Compound.

156. The Individual Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty the Individual Defendants owed and will continue to owe Choreo as former employees.

157. The Individual Defendants and Compound have been, or will be, unjustly enriched, and Choreo will be severely harmed, by the Individual Defendants' misappropriation and wrongful use and disclosure of Choreo's trade secrets on behalf of Compound, and the Individual Defendants and Compound will continue to threaten to use, actually use, divulge, inevitably

disclose, acquire and/or otherwise misappropriate Choreo's trade secrets, unless enjoined from doing so by this Court.

158.    The Individual Defendants' and Compound's past, present, and continuing improper threatened use, disclosure and/or misappropriation of Choreo's trade secrets has directly and proximately caused and, unless enjoined, will continue to cause Choreo substantial, immediate and irreparable injury to the value of its trade secrets and competitive advantage and goodwill, all of which Choreo has expended significant time, money, and effort to develop and secure, and for which Choreo has no adequate remedy at law.

159.    Each Individual Defendant's, as well as Compound's, conduct has been and is deliberate, willful and malicious, thereby entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count I against all Defendants:

A.    Enter a temporary restraining order, preliminary injunction and permanent injunction restraining and enjoining the Individual Defendants, Compound, and every person or entity acting in concert with them, from using, disclosing, retaining or otherwise misappropriating any of Choreo's trade secrets;

B.    Award Choreo compensatory and punitive damages in an amount to be determined at trial;

C.    Award Choreo attorneys' fees and costs in an amount to be determined at trial;

D.    Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

E.    Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT II – TRADE SECRET MISAPPROPRIATION; IOWA UNIFORM TRADE SECRETS ACT (IA CODE § 550.1 *et seq.*)

### *(Against All Defendants)*

160.    Choreo incorporates the paragraphs above as though fully restated herein.

161.    Choreo's client information, described in greater detail above, constitute "trade secrets" within the meaning of the Iowa Uniform Trade Secrets Act, IA Code § 550.1 *et seq.*, because Choreo derives independent economic value from this information, such information is not generally known nor readily ascertainable by proper means by others who could obtain economic value from its disclosure or use, and Choreo has exercised reasonable efforts to maintain the secrecy and confidentiality of such information.

162.    The Individual Defendants have misappropriated and inevitably will continue to improperly use, disclose and/or misappropriate Choreo's trade secrets for their own benefit and/or that of Compound, and to inflict grave commercial harm on Choreo by soliciting clients with such information and giving that information to Compound, a direct competitor of Choreo's, for Compound's unfair exploitation.

163.    Compound is vicariously liable for the Individual Defendants' unlawful conduct as the Individual Defendants used, disclosed and/or misappropriated Choreo's trade secrets for the benefit of Compound and as agents of Compound.

164.    The Individual Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty the Individual Defendants owed and continue to owe Choreo as former employees.

165.    The Individual Defendants and Compound have been, or will be, unjustly enriched, and Choreo will be severely harmed, by the Individual Defendants' misappropriation and wrongful

use and disclosure of Choreo's trade secrets on behalf of Compound, and the Individual Defendants and Compound will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Choreo's trade secrets, unless enjoined from doing so by this Court.

166.    The Individual Defendants' and Compound's past, present, and continuing improper threatened use, disclosure and/or misappropriation of Choreo's trade secrets has directly and proximately caused and, unless enjoined, will continue to cause Choreo substantial, immediate and irreparable injury to the value of its trade secrets and competitive advantage and goodwill, all of which Choreo has expended significant time, money, and effort to develop and secure, and for which Choreo has no adequate remedy at law.

167.    Each Individual Defendant's, as well as Compound's, conduct has been and is deliberate, willful and malicious, thereby entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count II against all Defendants:

A.    Enter a temporary restraining order, preliminary injunction and permanent injunction restraining and enjoining the Individual Defendants, Compound, and every person or entity acting in concert with them, from using, disclosing, retaining or otherwise misappropriating any of Choreo's trade secrets;

B.    Award Choreo compensatory and punitive damages in an amount to be determined at trial;

C.    Award Choreo attorneys' fees and costs in an amount to be determined at trial;

D.    Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

E.    Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT III – BREACH OF CONTRACT

### *(Against Defendant Kevin Lors)*

168.     Choreo incorporates the paragraphs above as though fully restated herein.

169.     The Lors Employment Agreement, including its Restrictive Covenants, is a valid and enforceable contract, ancillary to an employment relationship, supported by adequate consideration and entered into freely by Lors and without duress.

170.     The Lors Employment Agreement remains enforceable to protect the goodwill, client relationships, and confidential information of Choreo.

171.     The customer non-solicitation, non-diversion, and non-service restrictions at issue are narrowly tailored solely to prohibit Lors, during employment and for a period of one year thereafter, from directly or indirectly soliciting or servicing on his own behalf or on behalf of a competitor, any Covered Client.

172.     The employee non-solicitation restriction at issue is similarly narrowly tailored to prohibit Lors, during employment and for a period of two years thereafter, from directly or indirectly soliciting (or attempting to solicit), encouraging, offering or aiding anyone else in offering employment to any Choreo employee.

173.     The confidentiality provision prohibits Lors from using Choreo's confidential information for the benefit of anyone other than Choreo or disclosing that information to anyone outside of Choreo.

174.     But for his employment with Choreo, Lors would not have had access to Choreo's confidential information, client relationships, and goodwill at issue in this case.

175.     Choreo has a legitimate business interest in protecting its confidential client information, client relationships, and goodwill.

176.  Lors has breached or has threatened to breach the Lors Employment Agreement by soliciting, attempting to solicit, diverting, attempting to divert, servicing and attempting to service Covered Clients on behalf of Compound.

177.  Lors has further breached the Lors Employment Agreement by using Confidential Information (as defined in the Lors Employment Agreement) for his own personal benefit and/or the benefit of Compound.

178.  Lors has further breached the Lors Employment Agreement by directly and indirectly soliciting or attempting to solicit, and/or encouraging, fellow Choreo employees to leave Choreo.

179.  On information and belief, Lors' breaches of the Lors Employment Agreement are ongoing.

180.  Choreo has suffered, and will continue to suffer—unless Lors' conduct is enjoined—irreparable harm, including but not limited to (i) the loss of revenue-generating customer relationships, the monetary value of which cannot be readily calculated; (ii) the loss of its competitive advantage gained through the exclusive use of its confidential information; (iii) loss of goodwill with Covered Clients that Choreo has spent time and money developing; (iv) harm to its reputation in the industry and brand as a trusted advisory firm; and (v) destabilization of its business by undermining the notion that Choreo's clients are clients of Choreo, not those of any particular advisor, as a direct and proximate result of Lors' breaches of the Lors Employment Agreement.

181.  Choreo has also suffered monetary damages as a direct and proximate result of Lors' breaches of the Lors Employment Agreement.

182. While Choreo is entitled to liquidated damages under Paragraph 9 of the Lors Employment Agreement, monetary damages alone will not adequately compensate Choreo for the irreparable harm caused by Lors' breach of the Lors Employment Agreement, as Lors acknowledged when executing the Lors Employment Agreement.

183. Choreo is entitled to temporary and permanent injunctions to enforce its rights under the Lors Employment Agreement and to prevent further irreparable harm.

WHEREFORE, Plaintiff respectfully requests that this Court issue the following relief on Count III against Defendant Kevin Lors:

A. Enter temporary and permanent injunctions restraining and enjoining Lors from violating the Lors Employment Agreement;

B. Enter temporary and permanent injunctions restraining and enjoining Lors from soliciting or servicing Covered Clients, as defined in the Lors Employment Agreement;

C. Enter temporary and permanent injunctions restraining and enjoining Lors from using and disclosing Confidential Information, as defined in the Lors Employment Agreement;

D. Enter temporary and permanent injunctions restraining and enjoining Lors from soliciting, encouraging or offering employment to Choreo's employees, as set forth in the Lors Employment Agreement;

E. Award Choreo compensatory and liquidated damages in an amount to be determined at trial;

F. Award Choreo attorneys' fees and costs in an amount to be determined at trial;

G. Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

H. Award Choreo such other and further relief as the Court may deem just and appropriate.

## <u>COUNT IV – BREACH OF CONTRACT</u>

### *(Against Defendant Aaron Schomer)*

184. Choreo incorporates the paragraphs above as though fully restated herein.

185.     The Schomer Employment Agreement, including its non-solicitation and non-service provisions, is a valid and enforceable contract, ancillary to an employment relationship, supported by adequate consideration and entered into freely by Schomer and without duress.

186.     The Schomer Employment Agreement remains enforceable to protect the goodwill, client relationships, and confidential information of Choreo.

187.     The customer non-solicitation, non-diversion, and non-service restrictions at issue are narrowly tailored solely to prohibit Schomer, during employment and for a period of two years thereafter, from directly or indirectly soliciting or servicing on his own behalf or on behalf of a competitor, any Covered Client.

188.     The employee non-solicitation restrictions at issue are similarly narrowly tailored to prohibit Schomer, during employment and for a period of two years thereafter, from directly or indirectly soliciting (or attempting to solicit), encouraging, offering or aiding anyone else in offering employment to any Choreo employee.

189.     The confidentiality provision prohibits Schomer from using Choreo's confidential information for the benefit of anyone other than Choreo or disclosing that information to anyone outside of Choreo.

190.     But for his employment with Choreo, Schomer would not have had access to the Choreo confidential information, client relationships, and goodwill at issue in this case.

191.     Choreo has a legitimate business interest in protecting its confidential client information, client relationships, and goodwill.

192.     Schomer has breached or has threatened to breach the Schomer Employment Agreement by soliciting, attempting to solicit, diverting, attempting to divert, servicing and attempting to service Covered Clients on behalf of Compound.

193.    Schomer has further breached the Schomer Employment Agreement by using Confidential Information (as defined in the Schomer Employment Agreement) for his own personal benefit and/or the benefit of Compound.

194.    Schomer has further breached the Schomer Employment Agreement by directly and indirectly soliciting or attempting to solicit, and/or encouraging, fellow Choreo employees to leave Choreo.

195.    On information and belief, Schomer's breaches of the Schomer Employment Agreement are ongoing.

196.    Choreo has suffered, and will continue to suffer—unless Schomer's conduct is enjoined—irreparable harm, including but not limited to (i) the loss of revenue-generating customer relationships, the monetary value of which cannot be readily calculated; (ii) the loss of its competitive advantage gained through the exclusive use of its confidential information; (iii) loss of goodwill with Covered Clients that Choreo has spent time and money developing; (iv) harm to its reputation in the industry and brand as a trusted advisory firm; and (v) destabilization of its business by undermining the notion that Choreo's clients are clients of Choreo, not those of any particular advisor, as a direct and proximate result of Schomer's breaches of the Schomer Employment Agreement.

197.    Choreo has also suffered monetary damages as a direct and proximate result of Schomer's breaches of the Schomer Employment Agreement.

198.    While Choreo is entitled to liquidated damages under Paragraphs 6, 7, and 8 of the Schomer Employment Agreement, monetary damages alone will not adequately compensate Choreo for the irreparable harm caused by Schomer's breach of the Schomer Employment Agreement, as Schomer acknowledged when executing the Schomer Employment Agreement.

199.   Choreo is entitled to temporary and permanent injunctions to enforce its rights under the Schomer Employment Agreement and to prevent further irreparable harm.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count IV against Defendant Aaron Schomer:

A.   Enter temporary and permanent injunctions restraining and enjoining Schomer from violating the Schomer Employment Agreement;

B.   Enter temporary and permanent injunctions restraining and enjoining Schomer from soliciting or servicing Covered Clients, as defined in the Schomer Employment Agreement;

C.   Enter temporary and permanent injunctions restraining and enjoining Schomer from using and disclosing Confidential Information, as defined in the Schomer Employment Agreement;

D.   Enter temporary and permanent injunctions restraining and enjoining Schomer from soliciting, encouraging or offering employment to Choreo's employees, as set forth in the Schomer Employment Agreement;

E.   Award Choreo compensatory and liquidated damages in an amount to be determined at trial;

F.   Award Choreo attorneys' fees and costs in an amount to be determined at trial;

G.   Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

H.   Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT V – BREACH OF CONTRACT

### *(Against Defendant Joleen Scheer)*

200.   Choreo incorporates the paragraphs above as though fully restated herein.

201.   The Scheer Employment Agreement, including its non-solicitation and non-service provisions, is a valid and enforceable contract, ancillary to an employment relationship, supported by adequate consideration and entered into freely by Scheer and without duress.

202.  The Scheer Employment Agreement remains enforceable to protect the goodwill, client relationships, and confidential information of Choreo.

203.  The customer non-solicitation, non-diversion, and non-service restrictions at issue are narrowly tailored solely to prohibit Scheer, during employment and for a period of one year thereafter, from directly or indirectly soliciting or servicing on her own behalf or on behalf of a competitor, any Covered Client.

204.  The employee non-solicitation restrictions at issue are similarly narrowly tailored to prohibit Scheer, during employment and for a period of two years thereafter, from directly or indirectly soliciting (or attempting to solicit), encouraging, offering or aiding anyone else in offering employment to any Choreo employee.

205.  The confidentiality provision prohibits Scheer from using Choreo's confidential information for the benefit of anyone other than Choreo or disclosing that information to anyone outside of Choreo.

206.  But for her employment with Choreo, Scheer would not have had access to the Choreo confidential information, client relationships, and goodwill at issue in this case.

207.  Choreo has a legitimate business interest in protecting its confidential client information, client relationships, and goodwill.

208.  Scheer has breached or has threatened to breach the Scheer Employment Agreement by soliciting, attempting to solicit, diverting, attempting to divert, servicing and attempting to service Covered Clients on behalf of Compound.

209.  Scheer has further breached the Scheer Employment Agreement by using Confidential Information (as defined in the Scheer Employment Agreement) for her own personal benefit and/or the benefit of Compound.

210.     Scheer has further breached the Scheer Employment Agreement by directly and indirectly soliciting or attempting to solicit, and/or encouraging, fellow Choreo employees to leave Choreo.

211.     On information and belief, Scheer's breaches of the Scheer Employment Agreement are ongoing.

212.     Choreo has suffered, and will continue to suffer—unless Scheer's conduct is enjoined—irreparable harm, including but not limited to (i) the loss of revenue-generating customer relationships, the monetary value of which cannot be readily calculated; (ii) the loss of its competitive advantage gained through the exclusive use of its confidential information; (iii) loss of goodwill with Covered Clients that Choreo has spent time and money developing; (iv) harm to its reputation in the industry and brand as a trusted advisory firm; and (v) destabilization of its business by undermining the notion that Choreo's clients are clients of Choreo, not those of any particular advisor, as a direct and proximate result of Scheer's breaches of the Scheer Employment Agreement.

213.     Choreo has also suffered monetary damages as a direct and proximate result of Scheer's breaches of the Scheer Employment Agreement.

214.     While Choreo is entitled to liquidated damages under Paragraph 9 of the Scheer Employment Agreement, monetary damages alone will not adequately compensate Choreo for the irreparable harm caused by Scheer's breach of the Scheer Employment Agreement, as Scheer acknowledged when executing the Scheer Employment Agreement.

215.     Choreo is entitled to temporary and permanent injunctions to enforce its rights under the Scheer Employment Agreement and to prevent further irreparable harm.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count V against Defendant Joleen Scheer:

    A.    Enter temporary and permanent injunctions restraining and enjoining Scheer from violating the Scheer Employment Agreement;

    B.    Enter temporary and permanent injunctions restraining and enjoining Scheer from soliciting or servicing Covered Clients, as defined in the Scheer Employment Agreement;

    C.    Enter temporary and permanent injunctions restraining and enjoining Scheer from using and disclosing Confidential Information, as defined in the Scheer Employment Agreement;

    D.    Enter temporary and permanent injunctions restraining and enjoining Scheer from soliciting, encouraging or offering employment to Choreo's employees, as set forth in the Scheer Employment Agreement;

    E.    Award Choreo compensatory and liquidated damages in an amount to be determined at trial;

    F.    Award Choreo attorneys' fees and costs in an amount to be determined at trial;

    G.    Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

    H.    Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT VI – BREACH OF CONTRACT

### *(Against Defendant Lindsey O'Neil)*

216.    Choreo incorporates the paragraphs above as though fully restated herein.

217.    The O'Neil Employment Agreement, including its non-solicitation and non-service provisions, is a valid and enforceable contract, ancillary to an employment relationship, supported by adequate consideration and entered into freely by O'Neil and without duress.

218.    The O'Neil Employment Agreement remains enforceable to protect the goodwill, client relationships, and confidential information of Choreo.

219.    The customer non-solicitation, non-diversion, and non-service restrictions at issue are narrowly tailored solely to prohibit O'Neil, during employment and for a period of one year thereafter, from directly or indirectly soliciting or servicing on her own behalf or on behalf of a competitor, any Covered Client.

220.    The employee non-solicitation restrictions at issue are similarly narrowly tailored to prohibit O'Neil, during employment and for a period of two years thereafter, from directly or indirectly soliciting (or attempting to solicit), encouraging, offering or aiding anyone else in offering employment to any Choreo employee.

221.    The confidentiality provision prohibits O'Neil from using Choreo's confidential information for the benefit of anyone other than Choreo or disclosing that information to anyone outside of Choreo.

222.    But for her employment with Choreo, O'Neil would not have had access to the Choreo confidential information, client relationships, and goodwill at issue in this case.

223.    Choreo has a legitimate business interest in protecting its confidential client information, client relationships, and goodwill.

224.    O'Neil has breached and continues to threaten to breach the O'Neil Employment Agreement by soliciting, attempting to solicit, diverting, attempting to divert, servicing and attempting to service Covered Clients on behalf of Compound.

225.    O'Neil has further breached the O'Neil Employment Agreement by using Confidential Information (as defined in the O'Neil Employment Agreement) for her own personal benefit and/or the benefit of Compound.

226.    O'Neil has further breached the O'Neil Employment Agreement by directly and indirectly soliciting or attempting to solicit, and/or encouraging, fellow Choreo employees to leave Choreo.

227.    On information and belief, O'Neil's breaches of the O'Neil Employment Agreement are ongoing.

228.    Choreo has suffered, and will continue to suffer—unless O'Neil's conduct is enjoined—irreparable harm, including but not limited to (i) the loss of revenue-generating customer relationships, the monetary value of which cannot be readily calculated; (ii) the loss of its competitive advantage gained through the exclusive use of its confidential information; (iii) loss of goodwill with Covered Clients that Choreo has spent time and money developing; (iv) harm to its reputation in the industry and brand as a trusted advisory firm; and (v) destabilization of its business by undermining the notion that Choreo's clients are clients of Choreo, not those of any particular advisor, as a direct and proximate result of O'Neil's breaches of the O'Neil Employment Agreement.

229.    Choreo has also suffered monetary damages as a direct and proximate result of O'Neil's breaches of the O'Neil Employment Agreement.

230.    While Choreo is entitled to liquidated damages under Paragraph 9 of the O'Neil Employment Agreement, monetary damages alone will not adequately compensate Choreo for the irreparable harm caused by O'Neil's breach of the O'Neil Employment Agreement, as O'Neil acknowledged when executing the O'Neil Employment Agreement.

231.    Choreo is entitled to temporary and permanent injunctions to enforce its rights under the O'Neil Employment Agreement and to prevent further irreparable harm.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count VI against Defendant Lindsey O'Neil:

A.      Enter temporary and permanent injunctions restraining and enjoining O'Neil from violating the O'Neil Employment Agreement;

B.      Enter temporary and permanent injunctions restraining and enjoining O'Neil from soliciting or servicing Covered Clients, as defined in the O'Neil Employment Agreement;

C.      Enter temporary and permanent injunctions restraining and enjoining O'Neil from using and disclosing Confidential Information, as defined in the O'Neil Employment Agreement;

D.      Enter temporary and permanent injunctions restraining and enjoining O'Neil from soliciting, encouraging or offering employment to Choreo's employees, as set forth in the O'Neil Employment Agreement;

E.      Award Choreo compensatory and liquidated damages in an amount to be determined at trial;

F.      Award Choreo attorneys' fees and costs in an amount to be determined at trial;

G.      Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

H.      Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT VII – BREACH OF FIDUCIARY DUTY

### (*Against Defendant Kevin Lors*)

232.   Choreo incorporates the paragraphs above as though fully restated herein.

233.   Based on his position with Choreo, Lors had a fiduciary relationship with Choreo, which included a duty of loyalty.

234.   Lors breached his fiduciary duties to Choreo by, among other things, while still employed by Choreo: (i) soliciting and encouraging the other Individual Defendants to leave Choreo in favor of Compound while still employed by Choreo; and (ii) sharing Choreo's

confidential information relating to its client relationships, assets under management and revenue with Choreo's direct competitor, Compound, while still employed by Choreo.

235.    Lors' breaches of his fiduciary duties have proximately caused Choreo harm, damage, and injury.

236.    Lors' conduct, as part of an organized scheme with the other Individual Defendants and Compound, is an egregious demonstration of his willful and wanton disregard for the rights of Choreo, thereby entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count VII against Defendant Kevin Lors:

   A.    Disgorgement of salary paid to Lors while in breach of his fiduciary duties to Choreo;

   B.    Award Choreo compensatory and punitive damages in an amount to be determined at trial;

   C.    Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

   D.    Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT VIII – BREACH OF FIDUCIARY DUTY

### *(Against Defendant Aaron Schomer)*

237.    Choreo incorporates the paragraphs above as though fully restated herein.

238.    Based on his position with Choreo, Schomer had a fiduciary relationship with Choreo, which included a duty of loyalty.

239.    Schomer breached his fiduciary duties to Choreo by, among other things, while still employed by Choreo: (i) soliciting and encouraging the other Individual Defendants to leave Choreo in favor of Compound while still employed by Choreo; and (ii) sharing Choreo's

confidential information relating to its client relationships, assets under management and revenue with Choreo's direct competitor, Compound, while still employed by Choreo.

240. Schomer's breaches of his fiduciary duties have proximately caused Choreo harm, damage, and injury.

241. Schomer's conduct, as part of an organized scheme with the other Individual Defendants and Compound, is an egregious demonstration of his willful and wanton disregard for the rights of Choreo, thereby entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count VIII against Defendant Aaron Schomer:

> A. Disgorgement of salary paid to Schomer while in breach of his fiduciary duties to Choreo;
>
> B. Award Choreo compensatory and punitive damages in an amount to be determined at trial;
>
> C. Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and
>
> D. Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT IX – BREACH OF FIDUCIARY DUTY

### (Against Defendant Joleen Scheer)

242. Choreo incorporates the paragraphs above as though fully restated herein.

243. Based on her position with Choreo, Scheer had a fiduciary relationship with Choreo, which included a duty of loyalty.

244. Scheer breached her fiduciary duty of loyalty to Choreo by, among other things, while still employed by Choreo: (i) soliciting and encouraging the other Individual to leave Choreo in favor of Compound while still employed by Choreo; and (ii) sharing Choreo's confidential

information relating to its client relationships, assets under management and revenue with Choreo's direct competitor, Compound, while still employed by Choreo.

245. Scheer's breaches of her fiduciary duties have proximately caused Choreo harm, damage, and injury.

246. Scheer's conduct, as part of an organized scheme with the other Individual Defendants and Compound, is an egregious demonstration of her willful and wanton disregard for the rights of Choreo, thereby entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count IX against Defendant Joleen Scheer:

A.  Disgorgement of salary paid to Scheer while in breach of her fiduciary duties to Choreo;

B.  Award Choreo compensatory and punitive damages in an amount to be determined at trial;

C.  Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

D.  Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT X – BREACH OF FIDUCIARY DUTY

### (*Against Defendant Lindsey O'Neil*)

247. Choreo incorporates the paragraphs above as though fully restated herein.

248. Based on her position with Choreo, O'Neil had a fiduciary relationship with Choreo, which included a duty of loyalty.

249. O'Neil breached her fiduciary duties to Choreo by, among other things, while still employed by Choreo: (i) soliciting and encouraging the other Individual Defendants to leave Choreo in favor of Compound while still employed by Choreo; and (ii) sharing Choreo's

confidential information relating to its client relationships, assets under management and revenue with Choreo's direct competitor, Compound, while still employed by Choreo.

250. O'Neil's breaches of her fiduciary duties have proximately caused Choreo harm, damage, and injury.

251. O'Neil's conduct, as part of an organized scheme with the other Individual Defendants and Compound, is an egregious demonstration of her willful and wanton disregard for the rights of Choreo, thereby entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count X against Defendant Lindsey O'Neil:

A. Disgorgement of salary paid to O'Neil while in breach of her fiduciary duties to Choreo;

B. Award Choreo compensatory and punitive damages in an amount to be determined at trial;

C. Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

D. Award Choreo such other and further relief as the Court may deem just and appropriate

## COUNT XI – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (*Against Defendant Kevin Lors*)

252. Choreo incorporates the paragraphs above as though fully restated herein.

253. Lors was or should have been aware that, based on their positions at Choreo, the other Individual Defendants owed fiduciary duties to Choreo.

254. Lors encouraged the other Individual Defendants to breach their fiduciary duties to Choreo by, at least: (i) encouraging the other Individual Defendants to coordinate their exit and convince the other Individual Defendants to leave Choreo in favor of Compound; and

(ii) encouraging the other Individuals Defendants to share Choreo's confidential information with Compound.

255.   Lors knew that these actions were tortious but assisted the other Individual Defendants' breaches of fiduciary duties anyway.

256.   Lors' assistance with the other Individual Defendants' breaches of fiduciary duties was substantial and caused significant monetary damage to Choreo, in an amount to be determined at trial.

257.   Lors' egregious conduct demonstrates a willful and wanton disregard for the rights of Choreo, entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XI against Defendant Kevin Lors:

A.   Award Choreo compensatory and punitive damages in an amount to be determined at trial;

B.   Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

C.   Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT XII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (*Against Defendant Aaron Schomer*)

258.   Choreo incorporates the paragraphs above as though fully restated herein.

259.   Schomer was or should have been aware that, based on their positions at Choreo, the other Individual Defendants owed fiduciary duties to Choreo.

260.   Schomer encouraged the other Individual Defendants to breach their fiduciary duties to Choreo by, at least: (i) encouraging the other Individual Defendants to coordinate their exit and convince the other Individual Defendants to leave Choreo in favor of Compound; and

(ii) encouraging the other Individuals Defendants to share Choreo's confidential information with Compound.

261.    Schomer knew that these actions were tortious but assisted the other Individual Defendants' breaches of fiduciary duties anyway.

262.    Schomer's assistance with the other Individual Defendants' breaches of fiduciary duties was substantial and caused significant monetary damage to Choreo, in an amount to be determined at trial.

263.    Schomer's egregious conduct demonstrates a willful and wanton disregard for the rights of Choreo, entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XII against Defendant Aaron Schomer:

      A.      Award Choreo compensatory and punitive damages in an amount to be determined at trial;

      B.      Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

      C.      Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT XIII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (*Against Defendant Joleen Scheer*)

264.    Choreo incorporates the paragraphs above as though fully restated herein.

265.    Scheer was or should have been aware that, based on their positions at Choreo, the other Individual Defendants owed fiduciary duties to Choreo.

266.    Scheer encouraged the other Individual Defendants to breach their fiduciary duties to Choreo by, at least: (i) encouraging the other Individual Defendants to coordinate their exit and convince the other Individual Defendants to leave Choreo in favor of Compound; and

(ii) encouraging the other Individuals Defendants to share Choreo's confidential information with Compound.

267.    Scheer knew that these actions were tortious but assisted the other Individual Defendants' breaches of fiduciary duties anyway.

268.    Scheer's assistance with the other Individual Defendants' breaches of fiduciary duties was substantial and caused significant monetary damage to Choreo, in an amount to be determined at trial.

269.    Scheer's egregious conduct demonstrates a willful and wanton disregard for the rights of Choreo, entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XIII against Defendant Joleen Scheer:

    A.    Award Choreo compensatory and punitive damages in an amount to be determined at trial;

    B.    Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

    C.    Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT XIV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (*Against Defendant Lindsey O'Neil*)

270.    Choreo incorporates the paragraphs above as though fully restated herein.

271.    O'Neil was or should have been aware that, based on their positions at Choreo, the other Individual Defendants owed fiduciary duties to Choreo.

272.    O'Neil encouraged the other Individual Defendants to breach their fiduciary duties to Choreo by, at least: (i) encouraging the other Individual Defendants to coordinate their exit and convince the other Individual Defendants to leave Choreo in favor of Compound; and

(ii) encouraging the other Individuals Defendants to share Choreo's confidential information with Compound.

273. O'Neil knew that these actions were tortious but assisted the other Individual Defendants' breaches of fiduciary duties anyway.

274. O'Neil's assistance with the other Individual Defendants' breaches of fiduciary duties was substantial and caused significant monetary damage to Choreo, in an amount to be determined at trial.

275. O'Neil's egregious conduct demonstrates a willful and wanton disregard for the rights of Choreo, entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XIV against Defendant Lindsey O'Neil:

      A.    Award Choreo compensatory and punitive damages in an amount to be determined at trial;

      B.    Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

      C.    Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT XV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY OF LOYALTY

### (*Against Compound*)

276. Choreo incorporates the paragraphs above as though fully restated herein.

277. Compound was or should have been aware that, based on their positions at Choreo, the Individual Defendants owed fiduciary duties to Choreo.

278. Compound encouraged the Individual Defendants to breach their fiduciary duties to Choreo, including, but not limited to, the following ways: (i) encouraging each Individual Defendant to solicit and encourage the other Individual Defendants to leave their employment with

Choreo in favor of Compound; and (ii) encouraging each Individual Defendant to misuse Choreo's confidential information.

279.    Compound knew that these actions were tortious but assisted the Individual Defendants' breaches of fiduciary duties anyway.

280.    Compound's assistance with the Individual Defendants' breaches of fiduciary duties was substantial and caused significant monetary damage to Choreo, in an amount to be determined at trial.

281.    Compound's egregious conduct demonstrates a willful and wanton disregard for the rights of Choreo, entitling Choreo to punitive damages.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XV against Compound:

> A.    Award Choreo compensatory and punitive damages in an amount to be determined at trial;
>
> B.    Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and
>
> C.    Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT XVI – TORTIOUS INTERFERENCE WITH A CONTRACT

### *(Against Compound)*

282.    Choreo incorporates the paragraphs above as though fully restated herein.

283.    Compound had knowledge of the Individual Defendants' post-employment obligations, due to, among other things: (i) on information and belief, the Individual Defendants shared copies of the Employment Agreements with Compound; (ii) in October of 2024, less than four months prior to the Individual Defendants' acceptance of employment offers with Compound, Choreo had initiated a lawsuit against a former Choreo advisor who left to join Compound and

was bound by a nearly identical agreement; and (iii) Choreo placed Compound's counsel (who also represents the Individual Defendants) on notice of these restrictions through letters to the Individual Defendants.

284. Despite its undisputed familiarity with Choreo's efforts to protect its employee and client relationships as well as its confidential information, Compound targeted the Individual Defendants and encouraged them to disobey their post-employment obligations to Choreo.

285. For example, in its effort to recruit the Individual Defendants, Compound offered to pay each Individual Defendant 50% of their annual revenue based on the book of business they service at Choreo, despite knowing that the Individual Defendants were barred from bringing Covered Clients to Compound.

286. On information and belief, Compound encouraged the Individual Defendants to recruit and encourage one another to leave Choreo, in violation of their employee non-solicitation obligations. Choreo is also informed and believes that Compound encouraged the Individual Defendants to violate their confidential obligations to Choreo by sharing confidential information about Choreo's clients, assets under management and revenue.

287. Choreo is further informed and believes that Compound informed the Individual Defendants that they need not comply with their customer non-service obligations.

288. Choreo is informed and believes that Compound advised the Individual Defendants to reach out to Covered Clients after they left Compound to inform them of their departure from Choreo and new employment with Compound, in violation of their customer non-solicitation obligations.

289. Compound's interference was intentional and improper.

290. Compound's conduct is and continues to be willful, malicious and deliberate and a blatant disregard for the rights of Choreo, thereby entitling Choreo to punitive damages.

291. As a direct result of Compound's tortious interference with the Individual Defendants' Employment Agreements, Choreo has suffered monetary and non-monetary damages, in an amount to be proven at trial.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XVI against Compound:

> A.  Enter temporary and permanent injunctions restraining and enjoining Compound from encouraging or assisting the Individual Defendants in (i) soliciting or diverting, or attempting to solicit or divert, Choreo's clients; (ii) soliciting or encouraging Choreo's employees to leave Choreo or offering employment to Choreo's employees; or (iii) using, disclosing, retaining or otherwise misappropriating any of Choreo's trade secrets and Confidential Information (as defined in the Employment Agreement);
>
> B.  Award Choreo compensatory and punitive damages in an amount to be determined at trial;
>
> C.  Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and
>
> D.  Award Choreo such other and further relief as the Court may deem just and appropriate.

## <u>COUNT XVII – TORTIOUS INTERFERENCE WITH A CONTRACT</u>

### *(Against Defendant Kevin Lors)*

292. Choreo incorporates the paragraphs above as though fully restated herein.

293. In addition to having knowledge of his own Restrictive Covenants, which are substantially identical to those by which the other Individual Defendants are bound, Lors also had knowledge of the other Individual Defendants' post-employment obligations, because, on information and belief, the Individual Defendants shared information about the existence and

substance of their Restrictive Covenants with one another in coordinating their departure from Choreo.

294. Despite his personal knowledge of Choreo's efforts to protect its employee and client relationships as well as its confidential information, upon information and belief, Lors encouraged the other Individual Defendants to disobey their contractual obligations to Choreo by, among other things: (i) sharing Choreo's confidential information with Compound; and (ii) recruiting and encouraging one another to leave Choreo.

295. Lors' interference was intentional and improper.

296. Lors' conduct is and continues to be willful, malicious and deliberate and a blatant disregard for the rights of Choreo, thereby entitling Choreo to punitive damages.

297. As a direct result of Lors' tortious interference with the other Individual Defendants' Employment Agreements, Choreo has suffered monetary and non-monetary damages, in an amount to be proven at trial.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XVII against Defendant Kevin Lors:

> A. Award Choreo compensatory and punitive damages in an amount to be determined at trial;
>
> B. Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and
>
> C. Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT XVIII – TORTIOUS INTERFERENCE WITH A CONTRACT

### *(Against Defendant Aaron Schomer)*

298. Choreo incorporates the paragraphs above as though fully restated herein.

299. In addition to having knowledge of his own Restrictive Covenants, which are substantially identical to those by which the other Individual Defendants are bound, Schomer also had knowledge of the other Individual Defendants' post-employment obligations, because, on information and belief, the Individual Defendants shared information about the existence and substance of their Restrictive Covenants with one another in coordinating their departure from Choreo.

300. Despite his personal knowledge of Choreo's efforts to protect its employee and client relationships as well as its confidential information, upon information and belief, Schomer encouraged the other Individual Defendants to disobey their contractual obligations to Choreo by, among other things: (i) sharing Choreo's confidential information with Compound; and (ii) recruiting and encouraging one another to leave Choreo.

301. Schomer's interference was intentional and improper.

302. Schomer's conduct is and continues to be willful, malicious and deliberate and a blatant disregard for the rights of Choreo, thereby entitling Choreo to punitive damages.

303. As a direct result of Schomer's tortious interference with the other Individual Defendants' Employment Agreements, Choreo has suffered monetary and non-monetary damages, in an amount to be proven at trial.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XVIII against Defendant Aaron Schomer:

A. Award Choreo compensatory and punitive damages in an amount to be determined at trial;

B. Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

C. Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT XIX – TORTIOUS INTERFERENCE WITH A CONTRACT

### *(Against Defendant Joleen Scheer)*

304.  Choreo incorporates the paragraphs above as though fully restated herein.

305.  In addition to having knowledge of her own Restrictive Covenants, which are substantially identical to those by which the other Individual Defendants are bound, Scheer also had knowledge of the other Individual Defendants' contractual obligations, because, on information and belief, the Individual Defendants shared information about the existence and substance of their Restrictive Covenants with one another in coordinating their departure from Choreo.

306.  Despite her personal knowledge of Choreo's efforts to protect its employee and client relationships as well as its confidential information, upon information and belief, Scheer encouraged the other Individual Defendants to disobey their post-employment obligations to Choreo by, among other things: (i) sharing Choreo's confidential information with Compound; and (ii) recruiting and encouraging one another to leave Choreo.

307.  Scheer's interference was intentional and improper.

308.  Scheer's conduct is and continues to be willful, malicious and deliberate and a blatant disregard for the rights of Choreo, thereby entitling Choreo to punitive damages.

309.  As a direct result of Scheer's tortious interference with the other Individual Defendants' Employment Agreements, Choreo has suffered monetary and non-monetary damages, in an amount to be proven at trial.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XIX against Defendant Joleen Scheer:

    A.    Award Choreo compensatory and punitive damages in an amount to be
          determined at trial;

B.　Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

C.　Award Choreo such other and further relief as the Court may deem just and appropriate.

## COUNT XX – TORTIOUS INTERFERENCE WITH A CONTRACT

### *(Against Defendant Lindsey O'Neil)*

310.　Choreo incorporates the paragraphs above as though fully restated herein.

311.　In addition to having knowledge of her own Restrictive Covenants, which are substantially identical to those by which the other Individual Defendants are bound, O'Neil also had knowledge of the other Individual Defendants' post-employment obligations, because, on information and belief, the Individual Defendants shared information about the existence and substance of their Restrictive Covenants with one another in coordinating their departure from Choreo.

312.　Despite her personal knowledge of Choreo's efforts to protect its employee and client relationships as well as its confidential information, upon information and belief, O'Neil encouraged the other Individual Defendants to disobey their contractual obligations to Choreo by, among other things: (i) sharing Choreo's confidential information with Compound; and (ii) recruiting and encouraging one another to leave Choreo.

313.　O'Neil's interference was intentional and improper.

314.　O'Neil's conduct is and continues to be willful, malicious and deliberate and a blatant disregard for the rights of Choreo, thereby entitling Choreo to punitive damages.

315.　As a direct result of O'Neil's tortious interference with the other Individual Defendants' Employment Agreements, Choreo has suffered monetary and non-monetary damages, in an amount to be proven at trial.

WHEREFORE, Choreo respectfully requests that this Court issue the following relief on Count XX against Defendant Lindsey O'Neil:

A. Award Choreo compensatory and punitive damages in an amount to be determined at trial;

B. Award Choreo pre- and post-judgment interest calculated at the maximum allowed by law; and

C. Award Choreo such other and further relief as the Court may deem just and appropriate.

Dated: March 5, 2025                          Respectfully submitted,

                                              /s/ Randall D. Armentrout
                                              Randall D. Armentrout
                                              Dana Hempy
                                              NYEMASTER GOODE, P.C.
                                              700 Walnut Street, Suite 1300
                                              Des Moines, IA 50309-3899
                                              T: (515) 283-8161
                                              F: (515) 283-3108
                                              E: rdarment@nyemaster.com
                                              E: dhempy@nyemaster.com

                                              Alex C. Weinstein*
                                              Allison E. Czerniak*
                                              Ellen M. Hemminger*
                                              VEDDER PRICE P.C.
                                              222 North LaSalle
                                              Chicago, IL 60601
                                              T: (312) 609-7500
                                              F: (312) 609-5005
                                              E: aweinstein@vedderprice.com
                                              E: aczerniak@vedderprice.com
                                              E: ehemminger@vedderprice.com

                                              **ATTORNEYS FOR PLAINTIFF**
                                              **CHOREO LLC**
                                              *Motions for Admission *Pro Hac Vice*
                                              forthcoming.